Next case is number 22-20622, Commodity Futures Trading Commission v. EOX Holdings, and Mr. Kaczynski will hear from Mr. Geekus. Thank you, Your Honor. May it please the Court, good morning, I am Chris Geekus and I represent the appellant EOX Holdings, and Andrew Kaczynski with me today is my co-counsel in the case, Joe Wright, who is the general counsel of the parent corporation and is representing EOX Holdings. I think the controlling issue, I think, in the case that would result in basically a flat reversal without delving into complicated questions about the exercise of the discretion of the court and instructions and the admission of evidence has to do with the legal question as to what the meaning is of the language of taking the other side of an order, which I set forth on page 2 at the top of the page of the issues presented in my brief. And our position, I think, is quite simply that the district court, right from the beginning of the case in its first ruling, was wrong as a matter of law in saying that there is nothing in the regulation that limits its application in terms of taking the other side of an order to the principle involved in the case. This is a case in which an agent of a trader, and the trader is a guy named Jason Maccaro who was in the business of trading in energy block trades, granted trading discretion to Mr. Kaczynski, who was an employee of EOX Holdings. EOX Holdings is liable for his actions under a respondeat superior provision of the Commodity Exchange Act. And through that discretion, he entered trades and executed trades for one account of Mr. Maccaro. Mr. Maccaro had basically three different accounts at a succession of two FCMs, future commission merchants, which are the brokerage houses that handle money and clear the trades. And the question that is presented in regard to the conduct here is whether or not the simple act of Mr. Kaczynski as the agent, as the broker, executing the trades without having a financial interest in the trades constitutes taking the other side. And it's been our position that the person in that transaction who took the other side was Mr. Maccaro, the trader himself, into whose accounts the results of the trades were placed and who withstood the risk of the transactions and who benefited from the profits. And so when the district court said that there's nothing in the face of the regulation that limits it to the principal, he was talking about nothing that limits the prohibition of taking the other side of trades that excludes the agent, Mr. Kaczynski. You have to state it sort of two different ways. Our position is quite simply that the person who takes the other side of the trade, the trader— Has to be skin in the game. That's exactly it. Well, and as I understand it, no other infringement action has been brought under this reading in 39 years? That's correct. Now, I'm not familiar with trading in the market for electric blocks and futures. I assume it's a very sophisticated market. It's incredibly complex. I assume that there is a limited number of participants in that market. I assume that nearly all the participants know each other, have dealt with each other on multiple occasions. I mean, is that all fair to say, or is it supported— No, it is fair to say. There are millions of participants in the straight futures market, but this is doubly arcane. This is off the market. Well, this is doubly arcane because what it is, it's their trading in electricity, interest in electricity. And it used to be before the Dodd-Frank that they were known as swaps, and essentially these brokers served as middlemen. The economic function that they provided to the people interested in electricity and power was that they were a central matching service. One of the utilities in this case is known as PSEG. It's the north, P-S-E-G-L camps, and it's up in New Jersey. And, of course, they want to protect themselves from price fluctuations in electricity, so they want to go into this market. So they call up Andrew Kaczynski and they say, hey, look, I want to buy 500 megawatts of electricity for delivery in six months. Do you have somebody on the other side who's willing to pay whatever it is? And you know what? I'll bet a lot of that is known to both sides of a transaction because the guys in the north want to buy from the south for delivery in the winter and vice versa. Right. So I hope that our brief, we asked for extra words in length in our brief, and the reason that we did, and as we said in our motion which was granted, was because of the complexity of the description of the industry. And I hope that our brief sufficiently describes that complexity. When you layer onto that complexity a point that Your Honor just asked about, which was, was there any warning from the government about the fact that they were going to hold an executing broker liable for executing trades without having a financial interest in it, the answer to that was no. There's never been any announcement, regulatory or judicial, indeed even the CFTC hadn't taken any position that the principle of law that applied was the one that they tendered to the judge long after discovery closed and the principle that he included in his instruction to the jury, which was simply that you take the other side of the trade. If you make the decision to trade and execute, nothing about financial interest in it. But on the other side of this, so to speak, has had any of the brokers acted as the agent for traders? Well, this is a case in which block trading is done on a dual agency basis. What that means is that Well, I understand that, but you, Mr. Gazinsky, was more than a dual agent because he was an agent with authority to trade for one side as opposed to just an executing broker. That's right. I think our point is simply that if you look at the history of the law, and there's only four or five decisions that we cite in our brief from around the country that don't squarely, they don't deal at all with this regulation, and a couple of them in a glancing way talk about what does it mean to take the other side of the order, and they all say consistently that it means you have to be a counterparty. And a counterparty, and there's evidence about this, and the law defines that a counterparty is the person who has the skin in the game. Well, if this were stock trading, I guess on the open market it wouldn't matter if the broker had an agency agreement because you couldn't possibly affect, with very few exceptions, you couldn't possibly affect the market, right? But, I mean, the fact that Mr. Gazinsky had that this had not been done before and that Mr. Gazinsky had to get an exception from the company in order to be the agent here suggests that there was some reason why they hadn't done that in the past. Well, there are principles from the dark side of human life, and there's three that I think are involved in this case, and the first one is that no good deed goes unpunished. We have a footnote 8 in our brief that gives a very short statement by Mr. Vercaro as to why it is that he asked for discretion. This came from him on a request, and the reason is quite simple. He was up in Calgary in Canada, and he would travel back and forth to the United States, and he'd have to get up to go to lunch and the like, and he couldn't cover his position. So he says, and his testimony is quoted in footnote 8, he said that he needed somebody to make a decision to cover his risk when he was unable to do so. And so what the company did is it insisted, the CEO of the company, insisted, well, Mr. Gazinsky went to the CEO and said, This guy needs this help. Can we offer him? Can we get a waiver of the prohibition against discretionary trades? Why? And it was explained. He said, Okay, I want you to clear it in-house with our general counsel, and then I want you to go to the exchange. Go to ICE, the Intercontinental Exchange, get it approved with them, and then go to the clearing brokers, the FCMs, and get it approved with their compliance departments. They did that. It got approved. It never occurred to anybody that by executing, exercising discretion for the trades, that he would be deemed as taking the other side of the trade. They got approved by ICE? They did. They got approved, and it's described in our brief, and by the compliance department of the FCMs. And this kind of has an inverted side to it. Nobody said, Oh, by the way, you're going to be deemed as taking the other side of the trade. The reason that they didn't do it is because, as the few cases that had glanced off this issue established over the years, taking the other side of the trade means becoming a counterparty, which he wasn't going to do. There are two other things that I have questions about. Okay. One of them is that the jury did find the defendants liable for using disclosing information of some of the clients on the other side, and that's not appealed. That's right. Okay. Tell me about that. Why doesn't that tie in to the harm being done by this agency relationship? Well, this is a puzzling case because the lead count that prevented the case from being resolved by agreement was the CFTC's first insider trading case. What Congress did is that they took 10b-5 out of the Securities and Exchange Act and they put it into the Commodity Exchange Act, really without any kind of an explanation of what the purpose was or what the problem was they were trying to solve. And so the lead count in this was the fraudulent disclosure of the identity of traders to Mr. Vercaro, and the complaint alleged 21 instances of it. By the time we got to trial, there were only five, I think six, that they alleged. But as the jury found for Mr. Kaczynski and for EOX on that, they were in the language of the criminal argot, they were acquitted of that. They were found not liable. But the government tacked on the first part of Regulation 155.4 as well, which was the disclosure that you're holding an order that you've received from another person. And for the, you know, the case started out with 21, and the jury found that they had, in fact, that Mr. Kaczynski had disclosed orders. And the problem was, and the testimony by Mr. Kaczynski was, that basically he goofed. This was at a time when the practice in the industry had been changed radically and turned upside down by Dodd-Frank. Disclosure of identities, disclosure of orders, in the old way of swap transactions that was unregulated, didn't go through futures exchange, was routine. It was happening all the time. It was just, and there were a whole bunch of other economic reasons why it was doing, the principal one being that one counterparty wants to know who the other counterparty is to make sure that the credit risk was worthy. That's the reason, that's the principal reason for it. Dodd-Frank eliminated all that. It moved these transactions on to futures exchange. And here the industry is, and Mr. Kaczynski is, struggling with the old way to adapt himself to the new way. So even though everybody's trading off the market in huge amounts, you're still under the same regulation that would bind me if I bought one, you know, 1,000 pork bellies or something. Okay. Yeah. One other question I have is your complaint about the scope of the injunction. Well, we don't quite understand. If they're found to have made improper disclosures, and if they're found to have taken the other side of the transaction, if the regulation is correct, if the district court's construction regulation is correct in that regard, we don't understand why the injunction does not restrict that to that. The two statutes that are just the language of which are generally recited in the order, in the injunction, cover a whole bunch of activity other than the things that they were found to have done in this case. And that's our point. Our point is that if there's an injunction, what you ought to enjoin them from is doing what they did wrong, which are these two limited things. Now, we think it spills out into the doctrine that's, I think, accepted in this circuit as well, about obey the law injunctions. That's the jargonistic title to it. We think that these are properly characterized as obey the law injunctions, and there's a whole pile of problems with them. And one of them is, is what happens if you do something else that violates the statute, even though it's not one of the, you know, you're going to lose your right to a jury trial. Thanks very much. Okay. Thank you. All right. Ms. Berry. Good morning. May it please the Court, Ragney Berry for the Commodity Futures Trading Commission. This appeal presents three issues. The first is, should the court disturb the jury's verdict that Kaczynski and EOX violated Regulation 155.4B 65 times? No. Second question is, should this court reverse the district court based on reasonable trial management decisions? Also no. The third question is, was the district court's injunction related to Regulation 155.4 proper? Yes. As to the first question, defendant's primary challenge on appeal is that the district court's jury instruction on Regulation 155.4B was improper. In this court, jury instructions are reviewed for abuse of discretion and the trial court has great latitude in framing the instructions. Regulation 155.4B is a rule intended to prevent conflict of interest between introducing brokers or affiliated persons and their customers. The regulation prohibits knowingly taking directly or indirectly the other side of any order of another person known to the broker or affiliated person by their relationship unless they have that person's prior consent. To me this comes down to what does that mean, taking the other side? Right. Which, well, it's not surprising that it's not obvious to me because I have an English degree, but has the CFTC ever argued for this particular interpretation of taking the other side before? As noted, this was the first case the CFTC brought for a Regulation 155.4 violation of taking the other side. So, I mean, how . . . why . . . it's not obvious to me that it means what the CFTC says it does. It's not obvious to me that it doesn't mean that. As Judge Jones says, it could mean skin in the game, which is different from the way that CFTC . . . how are they supposed to know about that . . . that they're violating the Reg? Your Honor, knowingly . . . the regulation requires that you knowingly take the other side of an order. There's no . . . That begs the question, what does it mean? What does it mean to take the other side? Taking the other side is taking a position, executing a trade. Yeah, but the whole question is does it mean that or does it mean skin in the game? It doesn't mean skin in the game. How do they know that? The regulation doesn't say that the person executing the trade . . . Yeah, it doesn't say what you said it says either. It just says taking the other side. How are we supposed to know? Does that term have some sort of history of enforcement, history of explanations so that people know what it means? So, in energy block trading, there are two sides to every order, and those are brokered through the middle. I know. I read the briefs. It's whether . . . If it means what Judge Jones said, skin in the game, which is counterparty, that's different from what happened here. If the regulation were . . . or if the court had instructed that you must have skin in the game or a financial interest in the transaction that nullifies the part of the provision that says you can indirectly take the other side . . .  Well, we have an example here where . . . Well, suppose you're the person . . . say the broker, Mr. Gazinsky, has used somebody else to step in to help him. He's gotten directions to make a trade from his client, and then someone else steps in and does his work for him. Does that mean there's a co-conspirator while he was having this relationship with the counterparty? Does that mean that other person is liable, too, because that other person stepped in on one occasion indirectly? I just want to be clear. The other person is an introducing broker or affiliated person? I can't remember the exact terms. The other person is stepping into Mr. Gazinsky's shoes in his capacity as having the trading rights for the moral. So the regulation applies to the introducing broker or affiliated person, and if that person is executing a trade against one of their own customers and has the authority to do so and to make the decisions as to the timing, the amount . . . This was brought as an insider fraud case, and according to the briefs, it ruined Gazinsky's reputation and he no longer has a job. That is not a small consequence of what eventually transpires, which is a mere regulatory violation. No damages, right? None of the parties on the other side of these transactions have filed suit, right? None of them experienced damages. So why couldn't you just give him a reprimand or a slap on the hand, not make him go through a lengthy trial and millions of dollars, although there were minor regulatory violations here? Your Honor, the CFTC has statutory authority to enforce these regulations. Well, you have statutory . . . Yeah, police have statutory authority to enforce the speeding rules, but they don't enforce them all of a sudden in a 70-mile-an-hour zone when someone's going 72. So explain to me how this directly or indirectly bears on the integrity of the market. When the person charged is not at risk personally. So we can take, for example, a real estate agent who's brokering a deal between two clients. One customer is telling the agent, I'm willing to go up to $100,000 on this deal, bottom is $50,000. The other customer is the agent's buddy and has told the agent or the broker, do whatever you will with this transaction. The customer on the one side is clueless but should and would want to know that the broker may not necessarily have their best interests in mind. Well, that's a different market. I mean, this is the market for block trade. It's off the market. It's not even on the market for a limited number of participants who have to meet extraordinarily stringent financial qualifications. They all know each other. They all have reason to know why party A is going to the south to buy electricity for the winter and vice versa. This is not your ordinary trading market. And yet you're acting, unless you can explain to me what's fundamentally wrong here, as if this is 72 in a 70-mile-an-hour zone. So one thing I just want to clarify is that the two customers on either side do not know who they're interacting with. They are telling the broker, I want to do a deal for this much, and the broker in this case has information or has the ability to decide. But there aren't many brokers, right? And this company has a portfolio of companies that they regularly deal with. This trader, EOX, has a portfolio of companies they regularly deal with, right? That's right. Let me ask you a different question. I'm looking at the jury charts themselves, and if I'm right, count two is the one we're talking about. The language in here about knowingly taking the other side of the customer orders, et cetera, defines knowingly. And then it says, an individual takes the other side of the order if he makes the decision to trade opposite the order and executes the trade opposite the order. It was not necessary for Mr. Kazinski to own or have a financial interest in the account he was trading from. My question is, as in most cases, jury charges are fought tooth and toenail in terms of what the judge is going to charge in a complex case. What authority or what citations did you give, not you personally, give Judge Lake in terms of the language that ended up in this charge? The regulation itself, we contend that knowingly, there's no other way to interpret the word knowingly taking the other side other than making that decision to trade and then executing the trade. Now, defendants argued over the course of the litigation that it required a proprietary interest or being a counterparty. The court twice rejected that. And to their claim that this was some sort of unfair surprise, that's not true. The CFTC proposed these instructions eight months prior to trial, and defendants, again, proposed only this counterparty requirement instruction, which was, again, rejected by the court. Well, but in the course of 39 years, it was novel. Well, this was an outlier where a broker decided to trade against his own customers. And I'll note that the regulation permits you to trade opposite your own customers so long as you inform those other customers. Mr. Gazinsky and EOX could have done so here, and they chose not to. Well, wasn't that part of the other counts had to do with some of that, right? Yes. And they haven't appealed those? That's right. I'll just note in addition that defendants have failed to cite any legal support for their interpretation of the regulation. Well, how can there be legal support if there's never been an enforcement action or a lawsuit brought about it before? So they cite cases regarding other industry contexts, and they argue that. Well, I mean, those are, you know, you cite the best authority you have. CFTC has nothing on its side except what it claims is plain language. I'll just point out, as the other cases go, they don't stand for the proposition that taking the other side means necessarily that you're a counterparty. No, but they all make that assumption. I agree they're dicta. You know, he does too. We take them for what they're worth. It suggests an understanding in the industry. Well, the evidence at trial didn't support an understanding in the industry of that. Well, what was the evidence at trial that didn't support it? I mean, they didn't put on any industry context related to energy block tradings and what taking the other side means. They did put on a few of the parties involved in transactions, didn't they? Yes, and the CFTC's evidence showed that this type of setup was extremely rare. They went through Mr. Kaczynski and EOX jumped through a lot of hoops to allow this to happen so that Mr. Vaccaro could allow Kaczynski to make the trading decisions. This is very rare and not in conformity with industry standards. Tell me about the breadth of the injunction. Your Honor, the injunction follows the language of Regulation 155.4. Well, I'm aware of that, but the violation was a narrow set of violations. Right, and Mr. Kaczynski violated both provisions of regulation. The language is no broader than what Mr. Kaczynski did. I don't think, well, I tend to disagree with that because it's very comprehensive. Well, he's challenging only the Regulation 155.4B injunctive language here, and that language and the language in the injunction prohibits disclosing the order information of other customers as well as knowingly taking the other side directly or indirectly of your other customers. Right, but it goes beyond that, doesn't it? I don't believe it does. I'm looking for it in here. Well, I'll try to find it and won't waste your time. The injunction complies with Rule 65. That's a conclusion. That's not an argument. Right, so. Well, Rule 65 requires that the injunction statewide was issued. This injunction does, that it states the terms specifically of the injunction. This injunction does, and that it describes in reasonable detail the acts sought to be restrained, and that's where the challenge is on appeal. The injunction specifically prohibits those acts that violate Rules 155.4B. For these reasons, the district court did not abuse its discretion in issuing the injunction. I would like to turn to the second question about trial management decisions and whether those should be reversed. Defendants have challenged the 10-hour time limit. The district court, pursuant to Federal Rules of Evidence 403 and 611, have broad discretion to place reasonable limits on the time allowed for trial presentation as well as to exercise reasonable control over the presentation of evidence. The district court's determination of a 10-hour limit was reasonable in light of the time it spent in the case issuing hundreds of pages of legal rulings, which also narrowed the issues for trial, and the several months' notice that it gave the parties, including announcing the 10-hour limit at the pretrial conference several months before, and defendants did not object at the time to that. The second question, or the second challenge to trial management decisions, was the timing of the charge conference. Federal Rule of Civil Procedure 51 requires only that it be held before the jury is instructed and before final arguments. The court did so here. Defendants' argument about unfair surprise lacks merit because the issue of Regulation 154 had been briefed extensively, and the court had twice rejected their interpretation and their only proposed instruction followed that interpretation. The third challenge that defendants raised to the trial court management is the verdict form. Defendants contend that the court erred in denying a particularized verdict with questions asking the jury to itemize each transaction by date and time. Defendants incorrectly characterized the district court's verdict as a general verdict, but in fact the district court used a general verdict with written questions, which is explicitly permitted by Rule 49. Let me draw you back to this injunction again. The second part of it, or it's Paragraph 5, where EOCS permanently is restrained from enjoining, make, it has to make copies of all oral communications and keep them for five years, and that goes on for almost an entire page describing what those are, keep and maintain all other regulatory records required to be kept by the Act, and for any personal account, having any commodity interests, and then that goes on for a page and a half. So how does that latter three pages of the injunction correlate with the verdict? I'd like to note first that defendants are only challenging Paragraph 4 of the injunction, so any arguments based on Paragraph 5 would be waived for appeal. Nevertheless, even if they didn't and even if they waived that, that's beyond the scope of the jury verdict, isn't it? All these keep these records because CFTC then would be able to come in at any time and say, oops, you missed some records here in contempt, right? I don't think Paragraph 5 is necessarily an obey the law injunction, which is what defendants are challenging. Well, if it hasn't been briefed, you're not prepared to answer that, so I understand that. I have one other question, and that deals with the relationship between this regulation and the ICE regulation. They said that they got approval from ICE to have this discretionary trading authority, and ICE mentioned nothing about that being illegal. So how do you explain that if ICE no doubt has to follow these regulations in the same way that EOCS and Kuczynski do? Right. So ICE may have authorized – let me start by saying the compliance with ICE regulations is not at issue here, but ICE may have authorized Kuczynski to have discretionary authority, but it did not authorize him to not comply with Regulation 155.4, which would require that Kuczynski inform the other side that he is making the discretionary decisions here. So the rules do not conflict. Well, that's one way to put it. The other way to put it is that ICE was not aware that there would be a violation, right? I mean, as I said, ICE has to implement the federal regulation as much as the traders do. Right. But ICE's knowledge of what Kuczynski was going to do with the authorization was not at issue here. You're saying that the discretionary trading authority violates the regulation? Not the discretionary trading authority itself. It was the idea that he was making these discretionary – Well, how can you – in this market, how can you exercise discretionary trading authority without taking the other side? That's exactly our point. You are taking the other side. How can you do it without – in this – just – I'm not – it's my ignorance. Just explain it to me. How can you have discretionary authority for a client when every broker represents both sides? So every broker represents both sides, but both sides typically have to inform the broker that they are willing to make a trade on the terms that are either proposed or they are proposing. In this case, Kuczynski is deciding what terms to make the trades on for Vaccaro, and that would be okay under the regulation if the customer on the other side was informed that it was their broker, who is supposed to be a neutral intermediary, that's actually making the decisions. So you're implying that ICE may not have known that – whether he was going to inform another side. That's right. That's right. But is there any evidence one way or the other in the record about that? I'm not sure, Your Honor, but I would submit that that evidence is not relevant to the question of whether Mr. Kuczynski violated Regulation 155.4. I'm out of time, but for all the reasons stated in our brief and here today, we ask that this court affirm the final judgment. Okay. Thank you. Thank you. Counsel, before you start, wherever you're going to start, let me get in a question while I can. I'm back on the jury charge question, and I'm looking at them, and there's a similar issue about the matter of taking the other side. As I noted, typically, this probably was vigorously contested, et cetera, et cetera. So in Judge Lake's ruling back in 2021, when this was all teed up, when he denied a ticket, the argument was that the agency was seeking to expand the regulation to conduct that it heretofore had not, I guess, sought. I may not be stating it accurately, but at least as to what I'm reading, was that the argument that the agency itself was being inconsistent in terms of how it had either construed the regulation, in this case, the fair notice argument, and coupled with the question is that a note in his ruling, he says the defense cited Stoler versus CFTC out of the Second Circuit of 1987. So just help me understand what that argument was, and what from Stoler was your argument as authority for the error that's here. Do you follow me? If I get my notes here. All right. There are two cases that we cite on the question that I understand that Your Honor raises. One of them is the Stoler case. We cite a case called Upton, and it has to do with the notice, essentially the notice question. In the Upton case, as I understand it, what happened was that the, I guess it was the SEC, issued a policy statement about some improper conduct, but they did it after the respondent's activities that allegedly would have violated had ended two years after. And that is closely analogous to what happened here. Your Honor, I understood you to ask the counsel the question about was there any prior authority that supported the construction, and the answer to that is clearly there was not. As a matter of fact, this construction of the regulation of what it means to take the other side that the judge adopted came from the CFTC for the first time at the end of 2022 in their proffered instructions. That's the first time in the history of 39 years of the regulation, and they proffered the language that if you make the decision to trade and execute, that that constitutes taking the other side. There was no prior, any regulatory judicial history of any kind prior to that. Your argument was that beyond a fair notice that somehow they had singled out your client to deviate from the practice? Well, I think the consequence of it was that there was a singling out of these folks. There's no question about that. I think that Judge Lake's opinion, to the extent that I recall it, talks about how there wasn't a change of position because the CFTC never said anything about construction. That's the whole point. The whole point here is that no one was ever given notice that making a decision to trade and executing constituted taking the other side, so that's the problem with it. The second rule of the dark side of life that applies here on the issue of the counsel bangs on, which is consent. It's okay to execute the trade and make the decision if you let the other side know. The rule is that damned if you do and damned if you don't. In count one, they alleged that it was fraudulent insider trading for Mr. Kaczynski to tell Jason Vaccaro who the traders were on the other side. In count two, what they're saying now is that he should have disclosed to the other traders that he was doing the trading. So those two things are on their face, absolutely irreconcilable. I think that there's a significant possibility here that, to the extent that these rules survive, that it will be unsettling in industry. We are unaware. There may be a case or two out there. We are unaware in this very narrow and highly specialized area of any litigation, any reported litigation, between traders and participants involving alleged misconduct of any kind, let alone this kind, by block trade brokers. And it's a very strange situation because it's a dual agency situation, and if you think about dual agency in the real estate context, there are all kinds of cases out there where people are aggrieved by a dual agent acting not in anyone's interest. But this is an industry in which there is no such history of litigation. And what that means is that the way that the industry has set up, the way the free market has worked to set this up, subject now to Dodd-Frank, is that it's extraordinarily efficient and it's free from dysfunction, the kind of dysfunctions that would result in litigation. This rule is going to unsettle that. It's going to significantly unsettle that because when the plaintiff's bar, and we make this argument in two places in both our briefs, when the plaintiff's bar gets a hold of the idea that a block trade broker who makes the decision to trade is subject to liability, as soon as you've got an aggrieved trader on one side for a two-cent difference with a 500-megawatt transaction, we're talking about millions of dollars, all of a sudden there's this incentive there to deluge the court with litigation. We think it's unfair. One of the case law that we cite in a completely different area, I acknowledge, is you've got to think about this case, but the case after this case, and then the case after that. So we ask the court just to flat reverse this on the question of law, which is ill-advised, we think. Thank you very much for your attention. All righty. That has worn us out. The court will stand in recess for five or ten minutes. Thank you very much.